IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

THOMAS J. BLAKE,

                              Plaintiff,

        v.

                                                            OPINION and ORDER

KELLI WILLARD WEST, MICHAEL DONOVAN,
DYLON RADTKE, CATHY FRANCOIS,                               21-cv-493-jdp
MICHELLE HAESE, MARY KAY TALLIER,
and SELENA FOX,

                              Defendants.

Plaintiff Thomas J. Blake, proceeding without counsel, alleges that prison officials violated his right to practice the Asatru religion by barring him from possessing certain religious items and denying him other religious accommodations. I granted him leave to proceed on claims under First Amendment Free Exercise Clause, Establishment Clause, and retaliation theories, and claims under the Religious Land Use and Institutionalized Persons Act (RLUIPA). Dkt. 8 and Dkt. 44. Both sides move for summary judgment. Dkt. 58 and Dkt. 79.

For the reasons stated below, I will deny Blake's motion for summary judgment in all respects, and I will grant defendants' motion for summary judgment in most respects. But I will deny defendants' motion for summary judgment on Blake's RLUIPA claim regarding the denial of a Valknot pendant because defendants fail to establish that their banning of the pendant is the least restrictive means to further their interest in prison security. I will also deny defendants' motion for summary judgment on Blake's free exercise claim for injunctive relief regarding the Department of Corrections' delays in processing inmate requests for religious accommodations. These claims will proceed to a bench trial after the court recruits counsel for Blake.

PRELIMINARY MATTERS

**A. Scope of claims**

I granted Blake leave to proceed on First Amendment free exercise and RLUIPA claims regarding the deprivation of the following:

- Valknot pendant;

- metal necklace to hold the pendant;

- personal oath rings;

- additional prayer oil scents;

- prayer beads;

- simultaneous possession of both rune tiles and rune cards;

- possession of multiple bottles of prayer oil;

- outdoor sacred space for those in the Pagan umbrella religious group; and

- creation of a separate "Northern Traditions" umbrella group.

I also granted Blake leave to proceed on the following claims:

- A First Amendment claim against defendant Michael Donovan for denying him congregate services during COVID-19 lockdowns in 2020.

- A First Amendment retaliation claim against Donovan for issuing a congregate worship schedule excluding Pagan services.

- A First Amendment Establishment Clause claim against Donovan for forcing him to be present at a Pagan congregate service while a Rastafarian inmate proselytized.

- An Establishment Clause claim against defendant Kelli Willard West for relying on people it considers Pagan experts, who push for their particular religious preferences and successfully limit the practices of inmates with different religious views.

- A free exercise claim regarding defendants delaying in considering his religious-accommodation requests.

2

In his consolidated brief replying to his own summary judgment motion and opposing defendants' summary judgment motion, Blake states that he wishes to abandon several of these claims, including his claims about personal oath rings, types of and amount of prayer oil, simultaneous possession of rune tiles and cards, outdoor Pagan space, compelled attendance at a Rastafarian service, and retaliatorily being denied congregate worship. Dkt. 103, at 1. So I will not address those claims further. Blake also wishes to dismiss defendants Cathy Francois and Michelle Haese. Dkt. 59, at 71.

## B. Expert testimony

I previously denied Blake's motion to be considered as an expert "for the structure, faith, practices, and beliefs of Wisconsin incarcerated Northern Traditionalists," without prejudice until defendants filed a formal motion on the issue. Dkt. 44 at 3. Blake now renews his motion to be considered an expert, Dkt. 58, and he also moves to "speak on behalf of the Wisconsin Incarcerated Northern Traditionalists," Dkt. 57. "Northern Traditionalists" is a larger grouping of religions that includes Blake's own Asatru that he would like to split off from the DOC's Pagan umbrella religious group. Defendants have responded to these motions.

Blake states, "The testimony that [he] proposes is strictly informational in design and in based solely on his personal observations and analysis of living within Wisconsin Corrections. This further extends to observations of the Pagan URG and Northern Traditionalists during sanctioned religious services and outside of sanction[ed] religious services." Dkt. 36, at 1. As with any other witness, I will consider Blake's lay testimony about his personal observations, which in this case include his explanation of his Asatru religion and its similarities to or differences from other religions in the Pagan umbrella group with which he shares congregate services. But his materials do not provide sufficient foundation for him to

provide expert testimony on such a broad topic as "the structure, faith, practices, and beliefs of Wisconsin incarcerated Northern Traditionalists."

Blake's request to speak for the Northern Traditionalists as a group is somewhat difficult to understand. He concedes that this lawsuit is not a class action. He seeks relief in this action that could have ramifications for how the DOC treats other Northern Traditionalists with practices similar to Blake's. But there is no reason for him to act as a "spokesperson" for those inmates, as he requests. Dkt. 57, at 3. I will deny this motion.

I will now turn to the parties' motions for summary judgment.

UNDISPUTED FACTS

I draw the following facts from the parties' proposed findings of fact and supporting evidence. These facts are undisputed unless otherwise noted.

Thomas Blake is a state of Wisconsin prisoner currently incarcerated at Redgranite Correctional Institution. Blake was previously housed at Green Bay Correctional Institution (GBCI) from 2006 to 2021, where most of the events concerning this lawsuit took place. But I take Blake to be saying that the restrictions imposed on his religious practice apply at every DOC prison.

During Blake's time at GBCI, defendants Dylon Radtke, Michael Donovan, and Mary Kay Tallier worked there: Radtke was the warden, Donovan was a chaplain, and Tallier was a corrections program supervisor. Defendant Kelli Willard West was a DOC Division of Adult Institutions religious practices coordinator and the chair of the Religious Practices Advisory Committee, which consults with staff members and community religious leaders in developing

religious policies in the prison system. Defendant Selena Fox is a private citizen and one of the community religious leaders who volunteered on that committee.

This case concerns Blake's religious practice of Asatru, which, as a Northern Traditionalist religion, "is a pre-Christian religion rooted in ancient Northern Europe." Dkt. 104, ¶ 16. The DOC groups the many religions practiced by prisoners into "umbrella" groups to manage its resources to provide accommodations for as many inmates as possible. The eight umbrella groups are: Catholic, Buddhist/Other Asian, Humanist/Atheist/Agnostic, Islam, Judaism, Native American/American Indian, Pagan, and Protestant/Other Christian. Asatru is part of the Pagan umbrella group.

Much of this case concerns Blake's request to change DOC policies to allow Asatru adherents additional religious items or accommodations. Rules for the various umbrella groups' allowances are set forth in policies such as Division of Adult Institutions policy Nos. 309.61.01 ("Religious Beliefs and Practices"), 309.61.02 ("Religious Property"), and the "Religious Property Chart" attached to policy No. 309.61.02.

The DOC handles requests for new religious practices in the following way. Inmates must submit a DOC-2075 "Request for New Religious Practice" form. That form is reviewed by the chaplain and chaplain supervisor at the particular prison (in this case defendants Donovan and Tallier or now-dismissed defendant Francois) who each make a recommendation and then forward the form to the DOC's central office for review by a religious practice coordinator (in this case defendant Willard West). That review consists of consultation with staff; gathering of information on typical practices from publicly available information and community spiritual leaders; the inmate's history of accommodation requests and conduct; and consideration of security and health issues, legal precedent, and the DOC's goals such as

rehabilitation and orderly operations. The review results in a recommendation by the Religious Practices Advisory Committee, generally supported by a several-page analysis of the factors considered. The institution warden (in this case most often defendant Radtke) makes the final decision.

In 2019 Blake made a series of requests for religious items, including: a Valknot pendant, a metal necklace to hold the pendant, possession of prayer beads for certain practices, a personal oath ring, additional types of and amounts of prayer oil, simultaneous possession of both rune tiles and rune cards, a new outdoor sacred space for those in the Pagan umbrella group, and creation of a Northern Traditions umbrella group separate from the Pagan group.

Decisions on Blake's DOC-2075 requests took between six and nine months to get a response from the committee; a request about prayer oil took about 13 months and a request to create a separate Northern Traditions umbrella group took about 17 months. Blake won a January 2020 grievance about excessive processing times for his requests.

There doesn't appear to be any internal rule giving DOC a deadline to make these determinations. During the timeframe at issue here, the DOC would receive about 140 of these requests each year. Defendants state that issuing timely responses has become more difficult over time because of increasing numbers of DOC-2075 requests, increasing complexity of those requests, and evolving caselaw involving RLUIPA claims. The DOC has attempted to address the backlog by increasing staff dedicated to reviewing these requests; the single position existing as of 2010 was joined by an additional half position in 2020, and as of April 2024 there were 2.1 positions. As of November 2024, the committee had processed 89 DOC-2075 in that calendar year, with a backlog of 132 requests pending.

As for the individual requests that Blake made, Blake's request for a Valknot pendant was returned to him, with instructions to resubmit his request with further explanation of why the Valknot pendant was necessary to Blake's religious practice given that he already possessed a Thor's Hammer pendant. The committee's opinion included discussion of a previous denial of the same request by Blake in 2015, noting that the Valknot symbol (three interlocking triangles) had a strong connection to white supremacists and could be seen as threatening to non-white inmates. Blake states that he did resubmit his request but that Willard West did not respond. Under current policy, Blake is allowed to display the Valknot symbol in his cell, but not with a pendant that can be worn throughout the prison.

Blake's desire for a metal necklace also spans multiple requests. In March 2019, Blake and the DOC settled a previous lawsuit in this court, *Blake v. Donovan*, No. 17-cv-774-jdp (W.D. Wis.), which included a claim in which Blake sought a leather, fabric, or metal pendant chain instead of the nylon or beaded lanyards otherwise required (the parties dispute whether Blake could also choose to carry his pendant in a pocket or on a keychain while keeping with his religious beliefs). As part of the settlement, the DOC agreed to allow Blake a leather cord for his pendant. Blake states that he was pressured into signing this settlement. He followed with a DOC-2075 request for a "natural/metal necklace"; his submissions make clear that he sought a metal necklace no longer than 28 inches and no thicker than an eighth of an inch, and not some other "natural" alternative. Blake stated that the leather cord was offensive to him for multiple reasons, including that it was unknown how the animal was slaughtered and that leather cords were less durable than metal. This request was denied, with defendants stating that Blake had already reached a settlement for the leather cord; that his religious need appeared to be insincere given his non-vegetarianism and use of animal-based and synthetic

7

materials in other contexts; and that metal necklaces posed a security threat, including their potential use as a ligature for strangulation attempts.

Blake also requested the creation of a Northern Traditions umbrella group to remove Asatru and similar religions from the Pagan umbrella group. Blake's 2019 request was the latest in a series of such requests that he had made. I take Blake to be saying that forcing together dissimilar Pagan and Northern Traditions groups hinders the ability of Northern Traditionalists to practice their religions, particularly given that each umbrella group is only given a certain amount of time in congregate settings, in which they trade off performing rituals. Blake believes that the DOC exaggerates the similarities between Pagan and Northern Traditions religions, in part based on guidance from defendant Fox, a Wiccan who authored the portion of the DOC's "Umbrella Religion Groups Overview Manual" discussing the Pagan umbrella group.

The committee rejected Blake's request as moot, stating that the current umbrella-group configuration already provided inmates with ample opportunities for congregate activities. They also charactered Blake's request as including a request to let inmates lead services rather than relying on an outside volunteer, which the committee rejected as a security threat, particularly given the prominence of white supremacist gang activity in Wisconsin prisons.

Although Blake brings a claim regarding possession of prayer beads, the parties do not discuss a 2075-request regarding that item. It is undisputed that Blake was allowed to possess prayer beads after he was granted an accommodation in 2017.

Early in the COVID-19 pandemic, the DOC canceled all congregate religious services and study groups were canceled. DOC also no longer allowed religious volunteers into the

8

prisons; these volunteers led certain types of services, including the Pagan umbrella group congregate services, which included a Blót ceremony for Asatru prisoners.

After a short time, some religious services were resumed, but on a modified basis: congregate services were restricted to no more than ten inmates at any one service, all inmates had to be from the same housing unit, and volunteers were still not allowed in the prisons. Defendant Chaplain Donovan conducted congregate religious services for the Catholic umbrella group (I infer that Donovan is Catholic), and supervised congregate activities for the Pagan, Islamic, and Native American umbrella groups that did not require an outside volunteer leader of the same faith.

In April 2020, Blake was housed in a unit that contained only one other Pagan inmate, who was Wiccan. According to Blake, Donovan spoke to several inmates on Blake's unit and offered congregate religious programming to the Islamic and Native American umbrella groups. Blake asked Donovan if the Pagan umbrella group would be able to conduct congregate services, and Donovan said that they could not, because there was no volunteer who could come to lead those services. Donovan states that Blake and the Wiccan inmate refused a Pagan congregate meeting supervised by Donovan that would have involved activities that didn't need a leader; Blake disputes that this offer was made.

Blake believed that the deprivation of congregate services was discriminatory; he asked for the name of Donovan's supervisor, who Donovan identified as defendant Tallier. Blake then sent correspondence to Tallier about the incident, to which Donovan responded, stating that the other umbrella groups participating in congregate services did so because they were either activities for which a leader/volunteer wasn't necessary, or in the case of the Catholic group, led by Donovan himself. Blake filed a grievance that was dismissed.

I will discuss additional facts as they become relevant to the analysis.

ANALYSIS

Many of Blake's claims are for relief under the Free Exercise Clause or RLUIPA concerning specific requests for religious items or accommodations.

To prevail on a First Amendment free exercise claim, a prisoner must show that (1) the defendants imposed a "substantial burden" on his religious exercise; and (2) the burden was not reasonably related to a legitimate penological interest. *Neely-Bey Tarik-El v. Conley*, 912 F.3d 989, 1003 (7th Cir. 2019); *Thompson v. Holm*, 809 F.3d 376, 379 (7th Cir. 2016). A substantial burden puts "substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Thompson*, 809 F.3d at 379.

RLUIPA prohibits correctional facilities receiving federal funds from imposing a substantial burden on a prisoner's religious exercise unless the burden is the "least restrictive means" of furthering a "compelling governmental interest." 42 U.S.C. § 2000cc-1(a)(1)–(2).

I granted Blake leave to proceed on individual-capacity RLUIPA claims for damages against each of the defendants. I had allowed Blake to proceed on these claims after the Supreme Court's decision in *Tanzin v. Tanvir*, 592 U.S. 43 (2020), which I reasoned made "the availability of monetary damages in RLUIPA cases . . . an open question." Dkt. 8 at 6. But I later reconsidered that point, concluding that *Tanzin* didn't affect the precedential value of previous cases concluding that damages are unavailable under RLUIPA. *Russell v. Lange*, Case No. 22-cv-333-jdp, Dkt. 14 at 5 (W.D. Wis. Jan. 11, 2023); *see also Greene v. Teslik*, Case No. 21-2154, 2023 WL 2320767, at *2 (7th Cir. Mar. 2, 2023) (holding that "RLUIPA

authorizes only injunctive relief against state officials"). So I will dismiss Blake's RLUIPA damages claims and consider only his claims for injunctive relief.

## A. Valknot pendant

I granted Blake leave to proceed on claims that defendants denied his DOC-2075 request for Valknot pendant. The parties' briefing makes clear that the point of the pendant is for Blake wear around the prison. So I'll discuss his claims in those terms.

### 1. RLUIPA claim

I will start with Blake's RLUIPA claim, because RLUIPA provides greater protection for religious liberty than the First Amendment itself. *See Holt v. Hobbs*, 574 U.S. 352, 357 (2015). If Blake's RLUIPA claim fails, his free exercise claim under the First Amendment necessarily fails, too. *Tanksley v. Litscher*, No. 15-cv-126-jdp, 2017 WL 3503377, at *3 (W.D. Wis. Aug. 15, 2017), *aff'd*, 723 F. App'x 370 (7th Cir. 2018).

In applying RLUIPA, courts have placed the initial burden on the plaintiff to show that he has a sincere religious belief and that his religious exercise was substantially burdened. *Holt*, 574 U.S. at 361–362; *Koger v. Bryan*, 523 F.3d 789, 797–98 (7th Cir. 2008). RLUIPA affords some deference to officials in prison operations: "in applying RLUIPA's statutory standard, courts should not blind themselves to the fact that the analysis is conducted in the prison setting." *See Holt*, 574 U.S. at 369. But the RLUIPA standard is "exceptionally demanding" on the government: "Congress enacted RLUIPA . . . to provide very broad protection for religious liberty." *Id.* at 356, 364.

Defendants do not dispute Blake's sincere religious belief in having a Valknot pendant. They do contend that Blake fails to show that his religious exercise is substantially burdened by not having the pendant, in part because he already has a Valknot symbol in his cell and

because he already has a Thor's Hammer pendant. Although an argument that a prisoner has other avenues to practice his religion might have been a persuasive argument before the Supreme Court's decision in *Holt*, it isn't persuasive after that decision. As I have previously stated in a RLUIPA case, "Just to be clear about where [the *Holt* decision] leaves the substantial burden analysis: any prohibition of requested religious property will constitute a substantial burden on a religious exercise, thus placing the burden on the prison to justify that prohibition." *Tanksley*, No. 15-cv-126-jdp, 2017 WL 3503377, at *6. The state doesn't cite any post-*Holt* caselaw suggesting that it can withstand a RLUIPA challenge by restricting only certain Valknot-related items or allowing a different religious emblem.

The burden then shifts to the defendants to demonstrate that their actions further a compelling governmental interest by the least restrictive means. *Cutter v. Wilkinson*, 544 U.S. 709, 712 (2005). Defendants cite institutional security as a compelling interest. In general, security is a compelling interest. *Id.* at 725, n.1. But it is not enough to invoke security in general terms; the state has the burden of showing that this interest is served by banning the Valknot pendant, and that the ban is the least restrictive means of furthering that interest. *Holt*, 574 U.S. at 363; *Tanksley*, No. 15-cv-126-jdp, 2017 WL 3503377, at *6.

Defendants produce their responses to Blake's 2015 and 2019 requests, in which they state that "the valknot has been identified [as an] emblem with very strong connections to white supremacists, with stronger overtones than certain other racist-connected symbols," Dkt. 61-15, at 4, and that their consultation with various gang experts (such as the Federal Bureau of Prisons, the Anti-Defamation League, and the Southern Poverty Law Center, among others) concluded that the Valknot symbol "has been appropriated by racist, white supremacist hate groups [and] could symbolize a threat to non-white inmates and foster racial tension

within the inmate climate." *Id.* at 12. Defendants provide a declaration from John Kind, current Redgranite Correctional Institution security director who formerly held that post at GBCI, who states that "Blake asks to be able to wear this symbol everywhere he goes throughout the institution, and thus possibly create[es] unrest when viewed by any other person in the prison." Dkt. 84, ¶ 12. I am required to give some amount of deference to this rationale, although it is difficult to square that concept with the Supreme Court's description of the least-restrictive-means test as an "exceptionally demanding" standard; I have previously concluded that "[the state's] decisions are entitled to respect but not unquestioning deference." *Tanksley*, No. 15-cv-126-jdp, 2017 WL 3503377, at *7.

The problem for defendants is that similar rationales have been rejected in other cases about clothing items or jewelry. In *Schlemm v. Wall*, 784 F.3d 362 (7th Cir. 2015), the court of appeals reversed the judgment against a prisoner who sought to wear a colored headband under the security interest of preventing communication of gang status, stating in part, "The prison system does not contend that any given gang's members are unaware of which other prisoners belong to the same gang. . . . Because gang information may be widely available already, it is difficult to depict as 'compelling' a desire to cut out one potential means of identification." *Id.* at 366. That rationale would seem to apply here; it stands to reason that other inmates are aware that Blake practices Asatru, with the connotation that likely involves.

And defendants haven't presented enough evidence to show that a complete ban of the pendant is the least restrictive means of furthering a security interest. To be sure, DOC has taken measures to accommodate prisoners seeking to possess the Valknot symbol in other ways, such as allowing them to keep the emblem in their cells. That's evidence that DOC staff have carefully considered the ways in which the symbol might cause unrest at the prison. But Blake

states that he's disavowed white supremacy, and in any event, he says that other religious symbols, such as the Star of David and pentagram, have been similarly co-opted by gangs or hate groups yet are allowed as pendants for other religions. Blake also points out that the DOC's property chart already forbids inmates from wearing their pendants on the outside of their clothes, *see* Dkt. 86-4, at 2, so he questions why that restriction isn't enough. Defendants don't adequately address that issue. *See Knowles v. Pfister*, 829 F.3d 516, 519 (7th Cir. 2016) (reversing denial of preliminary injunction to prisoner barred from wearing Wiccan pentacle medallion "who is willing to wear his medallion under his shirt whenever he's outside his cell to protect himself from being identified as a gang member."); *Winfrey-Bey v. Shreve*, 733 F. Supp. 3d 673, 686 (C.D. Ill. 2024) ("A factfinder could conclude that, rather than outright prohibiting the possession of a tri-colored Circle 7 medallion, Graham could have restricted its use or visibility so there would be a lessened danger of signaling STG activity.").

Given the exceptionally demanding standard that RLUIPA places on governments, defendants have not sufficiently developed a record showing that the ban on Valknot pendants is the least restrictive means available to them to further their interest in security. Because of the need for further fact finding on the security rationale invoked by defendants, I will deny both parties' motions for summary judgment on Blake's RLUIPA claim about the Valknot pendant and that claim will proceed to trial.

## 2. Free exercise claim

As for Blake's free exercise claim for damages against the defendants involved in denying his request about the Valknot pendant, I conclude that defendants are entitled to qualified immunity.

14

Under the doctrine of qualified immunity, a plaintiff may not obtain damages for a constitutional violation against a public official unless the plaintiff shows that the official violated clearly established law. *Abbott v. Sangamon County, Ill.*, 705 F.3d 706, 725 (7th Cir. 2013). A clearly established right is one that is sufficiently clear such "that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012). Law is "clearly established" only if it is found in Supreme Court precedent, controlling circuit authority, or "a consensus of persuasive authority such that a reasonable officer could not have believed that his actions were lawful." *Wilson v. Layne*, 526 U.S. 603, 617 (1999). In other words, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

Blake bears the burden of demonstrating that his rights were clearly established to overcome qualified immunity. *Hernandez ex rel. Hernandez v. Foster*, 657 F.3d 463, 473 (7th Cir. 2011). He fails in that burden because he does not cite any authority—and I am unaware of any—clearly establishing that inmates have a First Amendment right to a religious pendant or other identifying item that prison staff believes could lead to unrest; *Schlemm* and *Knowles* are RLUIPA cases. *See also Winfrey-Bey*, 733 F. Supp. 3d at 688 (applying qualified immunity to prisoner's free exercise claim regarding religious medallion). So I will deny Blake's motion for summary judgment and grant defendants' motion on this claim.

## B. Metal necklace

I granted Blake leave to proceed on RLUIPA and free exercise claims for the deprivation of a "natural metal" necklace for his pendant. Unlike with the Valknot pendant itself, defendants do challenge the sincerity of Blake's belief that he required a metal necklace. Blake has given them reason to doubt his sincerity; in an earlier DOC-2075 request he requested a

"natural" necklace and suggested using leather, satin, or metal. After Willard West denied that request, Blake filed a lawsuit and agreed to a settlement including the accommodation of a leather cord. Blake now says that he previously suggested a leather option only to help other Pagan inmates who wanted that option, and that he was pressured into settlement. In his deposition he discussed the religious significance of a metal necklace, but in none of his evidentiary materials (his deposition, an affidavit, and a declaration) does he directly say that other types of natural, non-synthetic materials were insufficient for a religious perspective. He does discuss durability issues with natural-fiber or leather cords and the offensiveness of chemicals used in the tanning process and unethical treatment of animals. In unsworn statements in his brief he states that synthetic, natural-fiber, or leather cords violate his religious beliefs, although he does not articulate a consistent basis for why this is; many of his objections appear to be non-religious in nature, about the durability and cost of using a non-metal option. I conclude that Blake's sincerity is a disputed issue of material fact.

If Blake's asserted need for a metal necklace is sincere, the deprivation of that necklace is a substantial burden on his religious exercise. But defendants demonstrate that denying metal necklaces serves a compelling security interest: a metal necklace is a security threat because it could be used to strangle someone, and that they wouldn't be able to limit where Blake took the necklace, because Blake's intended use would be to wear it at all times.

Blake argues that there are other religious items, such as Jewish prayer shawls and Tefillin, that are similar strangulation risks; the property chart states that the shawls may be as large as 24 by 80 inches, and tefillin may have leather straps 8 to 10 feet in length. If the DOC allowed other similar items, that might show that banning Blake's proposed necklace wasn't the least restrictive means of furthering its interest in security. *See Holt*, 574 U.S. at 367–68

16

(underinclusive prison restriction undermines argument that restriction is least restrictive means to further compelling interest). But neither of those items is similar enough to make that showing: neither is metal and inmates are not allowed to have them at all times in the prison. Additionally, my own review of the property list shows that Catholic rosaries and Muslim prayer beads must be connected with string and not metal chains, so those items aren't direct comparators either.

Similarly, Blake argues that prisoners are allowed to possess various non-religious items that could be used to strangle someone, such as bed sheets, drawstrings, shoelaces, coaxial cable, and power cords. But presumably inmates aren't permitted to walk around the prison freely with these items in the way Blake proposes he be allowed to roam with his metal necklace (or at least inmates would have to undo their waistbands or shoelaces before brandishing them, making them impractical as a method of attack). Given the respect that I must give prison officials' decisions about their crucial interest in keeping prisons safe, I conclude that they have met their burden under RLUIPA to show that there isn't a less restrictive means than denying Blake's request to wear a metal necklace around the prison.

## C.  Prayer beads

Blake brings claims about being denied an accommodation for prayer beads for certain practices. But in his deposition he stated that he received an accommodation for prayer beads in 2017, and he does not discuss these claims in his briefing. I will deny his motion for summary judgment on these claims and grant defendants' motion.

## D.  Deprivation of congregate services during COVID-19 modified movement

I granted Blake leave to proceed on a free exercise claim regarding defendant Donovan's refusal to allow Blake and other Pagan inmates the opportunity to participate in Pagan

17

congregate services during COVID lockdowns because there wasn't a volunteer to lead them. Blake doesn't have a RLUIPA claim about this deprivation because COVID lockdowns are over and he is no longer incarcerated at GBCI.

In addition to the element that a prisoner's religious exercise is substantially burdened, the question whether the restrictions on a prisoner's religious exercise are reasonably related to a legitimate penological interest requires the court to consider four factors: (1) whether there is a "valid, rational connection" between the restriction and a legitimate governmental interest; (2) whether the prisoner retains alternatives for exercising the right; (3) the impact that accommodation of the right will have on prison administration; and (4) whether there are other ways that prison officials can achieve the same goals without encroaching on the right. *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 350–52 (1987) (citing factors articulated in *Turner v. Safley*, 482 U.S. 78, 89–91 (1987)).

Defendants argue that Blake's religious practice wasn't substantially burdened by the lack of congregate services because there weren't other Pagan umbrella group members available given the lockdowns and Blake turned down Donovan's proposed alternatives. But that's not the correct way of looking at a substantial burden: the DOC's decision to lock inmates down on their units was part of the reason that congregate services were cancelled and then only partially restored for some faiths. And Donovan didn't offer a full-fledged Pagan congregate service including the Blót that Asatru inmates would perform. The deprivation of that service was a substantial burden on Blake's practice.

Nonetheless, Blake's claim fails under the *Turner* factors. The first *Turner* factor—whether there is a "valid, rational connection" between the restriction and a legitimate governmental interest—is often viewed at the most important factor. *Singer v. Raemisch*,

593 F.3d 529, 534 (7th Cir. 2010) ("The four factors are all important, but the first one can act as a threshold factor regardless which way it cuts."). In evaluating whether there is a valid, rational connection between a restriction and the state's legitimate penological interests, the initial burden of proof rests on the defendant state officials. *Id.* at 536–37. Once the defendants offer a "plausible explanation" for the restriction, the burden shifts to the plaintiff to present evidence undermining the state officials' explanation. *Id.* Defendants state a plausible reason for the short-term ban on congregate services. Given the global pandemic, it was appropriate to restrict movement of inmates within the prison and to bar religious volunteers from entering the prison. *See Mays v. Dart*, 974 F.3d 810, 820–21 (7th Cir. 2020) (decisions on managing spread of COVID-19 in correctional facilities entitled to deference).

Blake attempts to undermine part of this rationale (as well as involving the other *Turner* factors) by stating that Donovan should have let him and the other Pagan inmate on his unit perform a congregate ceremony by themselves, without a volunteer. But the court of appeals has long concluded that prisons have legitimate penological interests in disallowing inmates from leading congregate religious services. *See, e.g., Johnson-Bey v. Lane*, 863 F.2d 1308, 1311 (7th Cir. 1988) ("The reasonableness of a regulation banning lay inmates from assuming positions of religious authority . . . cannot reasonably be doubted . . . ."); *Hadi v. Horn*, 830 F.2d 779, 785 (7th Cir. 1987) (potential for security problems in absence of imam was legitimate penological interest supporting cancellation of congregate prayer service).

Blake also argues that this security rationale is essentially false because GBCI allowed other faiths to hold congregate services during this timeframe without a volunteer. But it is undisputed that none of the other groups' services were ones requiring a volunteer leader: they were either services that could be performed without a leader or that Donovan performed

19

himself as a Catholic leader. So Blake doesn't show that Donovan bent the "no prisoner leader" rule for other faiths. I conclude that defendants have shown a rational connection between the deprivation here and the legitimate penological goals of fighting the pandemic and maintaining security. And the other *Turner* factors also weigh in defendants' favor: Blake retained non-congregate methods of practicing his faith, and there were no obvious, less restrictive alternatives that the prison could have employed to protect its interests in safety and security short of canceling congregate Pagan-umbrella-group ceremonies that required a leader. I will deny Blake's motion for summary judgment and grant defendants' motion for summary judgment on this free exercise claim.

### E.  Northern Traditions umbrella group

I granted Blake leave to proceed on free exercise and RLUIPA claims for defendants' denial of his request to create a Northern Traditions umbrella group separate from the Pagan umbrella group. But defendants point out that this court has previously concluded that "recognition as an umbrella group is not a religious exercise in itself, so it cannot give rise to a claim under RLUIPA or the free exercise clause." *Greybuffalo v. Wall*, No. 15-cv-8-bbc, 2016 WL 1559179, at *3 (W.D. Wis. Apr. 15, 2016). Rather, the key issue is "identify[ing] particular religious exercises that [plaintiff] was unable to observe in the absence of recognition as an umbrella group." *Id.* Nothing in Blake's submissions persuades me that I should diverge from the *Greybuffalo* decision. In short, Blake doesn't have an abstract right to a separate umbrella group.

But I can consider the administration of the Pagan umbrella group in considering each of Blake's claims about specific denials of religious property or services. And I also allowed Blake to proceed on free exercise and Establishment Clause claims that DOC policies give

prison officials too restrictive of control over what is considered orthodox religious practice. Blake fleshed out this claim in his amended complaint: I allowed him to add non-DOC-employee Selena Fox as a defendant for serving on the Religious Practice Advisory Committee as an advisor regarding the Pagan umbrella group. Fox is a Wiccan priestess, not an Asatru practitioner; Blake alleges that she pushes for her particular religious preferences and limits the practices of inmates with different religious views, harming his practice of Asatru.

Under the Establishment Clause of the First Amendment, Congress shall "make no law respecting an establishment of religion." Recently, the Supreme Court explained that the Establishment Clause is to be interpreted by "reference to historical practices and understandings." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 535 (2022).

This theory is not a good fit for Blake's claims because he doesn't present any facts suggesting that the DOC favors Wicca over Asatru merely by virtue of having a Wiccan adherent advising on the committee that makes rules for religious practice at the prison. It's reasonable for the DOC to seek input from religious advisors in implementing policies, and for obvious reasons it would be impracticable for the committee to include a direct advisor for every religion practiced by at least one DOC inmate.

Blake notes that Fox wrote the portion of the DOC's "Umbrella Religion Groups Overview Manual" discussing the Pagan umbrella group, and he argues that it focuses overwhelmingly on Wiccan practices and incorrectly characterizes Asatru as an "Earth-based" religion to keep it in the Pagan umbrella group when it is more properly characterized as an "ancestral based" religion dissimilar to the other sects in the Pagan group. Dkt. 106, ¶ 50. Under either a free exercise or Establishment Clause theory, Blake doesn't explain how the manual or Fox's definition of Asatru harms him in a concrete way, other than that the inclusion

of Asatru in the Pagan umbrella group means that he and other Asatru adherents must attend congregate celebrations alongside other Pagan adherents, trading off time to perform their rituals. But he has already abandoned the only direct claim I allowed him to proceed on about that practice, his Establishment Clause claim about being forced to listen to a Rastafarian prisoner proselytize during a Pagan congregate service.

As for the particular religious deprivations forming the basis for Blake's other claims, there isn't any indication that these deprivations ultimately boiled down to Fox's (or any other religious expert's) disagreement with Blake about Asatru's religious requirements. Rather, security and medical concerns were dispositive rationales for denying Blake the property or accommodations he sought, even for the one claim (regarding the Valknot pendant) that I am not dismissing. So Blake fails to show that he was harmed by the DOC's administration of the Asatru religion under the Pagan umbrella group. I will deny Blake's motion for summary judgment on these claims and grant defendants' motion for summary judgment on them.

**F.  Delays in reviewing requests**

I allowed Blake to proceed on a free exercise claim for injunctive relief against Willard West about defendants' delays in reviewing his various DOC-2075 requests, ranging up to 17 months in one instance. Because Blake brings this claim against Willard West in her official capacity, the claim operates as one against the state itself. *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). To establish that he is entitled to injunctive relief on his official-capacity claim, Blake must show that a policy or custom of the state played a part in the alleged constitutional deprivation. *Id.* The facts here raise a reasonable inference that the DOC's staffing policies played a role in the deprivation; even though the DOC has added staffing to process an increasing number of requests, although there still appears to be a significant backlog.

Blake eventually received rulings for all of his requests, which does not automatically mean that his claim for injunctive relief is moot, but there must be "some cognizable danger of recurrent violation, something more than the mere possibility." *Nelson v. Miller*, 570 F.3d 868, 882 (7th Cir. 2009) (internal quotations omitted). I conclude that Blake meets this standard because he has a long history of making DOC-2075 requests, he's settled previous lawsuits about them, and he has a claim still alive in this case. In short, he has had some amount of success in obtaining new religious items, and he seems likely to make additional requests in the future.

Defendants argue that Blake fails to show that these delays substantially burdened his religious practice, which is a tenuous argument given the broad definition of "substantial burden" that courts now must apply. In religious-diet cases, courts have concluded that delays of as many as five months weren't enough to violate the Constitution or RLUIPA, with many of those cases concluding that the short delays didn't constitute a substantial burden on the inmate's religious practice. *See, e.g.*, *Lambright v. Indiana*, No. 3:18-CV-553, 2020 WL 4451075, at *3 (N.D. Ind. Aug. 3, 2020) (collecting cases). But here the delays in processing a DOC-2075 requests have been significantly longer. And as of November 2024 there were more requests pending than the number of requests staff had processed so far that year. That suggests that even now, review times will often exceed a year. With further factual development it is conceivable that Blake could show a substantial burden.

Defendants also argue that they have a legitimate penological interest in taking their time to scrutinize prisoners' requests "with the goal of saying 'Yes'" while also coordinating with staff about considering security issues and other factors. Dkt. 81, ¶ 36. And they note that they've added staffing to process an increasing number of requests. I agree that defendants

have a legitimate penological interest in conducting a thorough review of inmates' requests, but the evidence suggests that delays are being caused not by the deliberative process, but rather by staff being overwhelmed with requests. Blake notes that he won a grievance about the delays with his requests, which itself doesn't provide a constitutional violation, but it does suggest that the DOC believes that the committee isn't pursuing its interests quickly enough.

Based on the limited record of how DOC-2075 requests are currently being processed, I can't tell for certain whether Blake is entitled to injunctive relief. So I will deny both parties' motions for summary judgment on this claim. Blake should be aware that he faces a high burden to prevail on this claim at trial: this court is limited to ordering injunctive relief that "is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." *See* 18 U.S.C. § 3626(a)(1)(A). And "'[p]rison officials have broad administrative and discretionary authority over the institutions they manage.'" *Westefer v. Neal*, 682 F.3d 679, 683 (7th Cir. 2012) (quoting *Hewitt v. Helms*, 459 U.S. 460, 467 (1983)).

CONCLUSION

The only claims that survive summary judgment are Blake's RLUIPA claim regarding the deprivation of a Valknot pendant, and his free exercise claim for injunctive relief regarding delays in the DOC's processing of requests for religious accommodations. Because only claims for equitable relief remain, Blake has no right to a jury trial. *Kramer v. Banc of Am. Sec., LLC*, 355 F.3d 961, 966 (7th Cir. 2004). The case will proceed to a court trial.

In other religious-rights litigation, the court of appeals has suggested that the district court "seriously consider recruiting counsel to assist [the plaintiff]" because "resolving his

claims may require evidence that a prisoner will find it hard to obtain and present." *Schlemm v. Wall*, 784 F.3d 362, 366 (7th Cir. 2015). For that reason and because the resolution of Blake's claims could have implications for other prisoners and for prison policies, it is appropriate to attempt to recruit counsel for Blake.

If I find counsel willing to represent Blake, I will advise the parties of that fact. Soon thereafter, a status conference will be held to set a new schedule. Blake should know that because of the large number of requests for counsel that the court receives, the search for counsel may take several months, and there is no guarantee that the court will be able to find counsel willing to represent him.

ORDER

IT IS ORDERED that:

1. Plaintiff Thomas J. Blake's motion to be treated as an expert, Dkt. 58, is DENIED.

2. Plaintiff's motion to "speak on behalf of the Wisconsin Incarcerated Northern Traditionalists," Dkt. 57, is DENIED.

3. Plaintiff's motion for summary judgment, Dkt. 58, is DENIED.

4. Defendants' motion for summary judgment, Dkt. 79, is GRANTED with respect to all of plaintiff's claims except the following:

   - plaintiff's claim under the Religious Land Use and Institutionalized Persons Act regarding a Valknot pendant.

   - plaintiff's official-capacity free exercise claim for injunctive relief regarding delays in processing of requests for religious accommodations.

5. Defendant Willard West will remain in the caption as the sole defendant for Blake's claims for injunctive relief. The remaining defendants are DISMISSED.

6.  The case is STAYED pending recruitment of counsel to assist plaintiff.

Entered March 25, 2025.

BY THE COURT:

/s/

_____

JAMES D. PETERSON
District Judge